IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 2:18-cr-416-TFM-SMD |
| | ) | |
| KEMOND JAREUZ FORTSON | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the Court is Defendant Kemond Jareuz Fortson's Motion to Suppress (Doc. 21). In the Motion, Defendant argues that his Fourth Amendment rights were violated when officers, who entered his apartment to execute a state-court arrest warrant, performed an illegal search under the guise of a protective sweep. *See generally* (Doc. 21). Defendant asserts that the evidence found during the warrantless search should be suppressed, and that the evidence and statements obtained as a product of the warrantless search—including the evidence obtained through a subsequently acquired search warrant for his apartment and his vehicle—should be suppressed as fruit of the poisonous tree. *Id.* at ¶ 18.

The Government responded (Doc. 37) to Defendant's Motion and on June 6, 2019, the undersigned conducted an evidentiary hearing on the matter. The undersigned reopened the hearing on July 16, 2019, to address the lack of evidence presented at the first hearing regarding the exact location of Defendant's arrest within his apartment and the relationship of that location to where the drug and other evidence was found. *See* (Doc. 62). At the conclusion of the July 16th hearing, the undersigned requested that the Government and

Defendant file supplemental briefs, pointing the undersigned to the evidence upon which they rely to support their positions regarding suppression. On July 22, 2019, the Government filed its supplemental brief (Doc. 80), as did Defendant (Doc. 79). Defendant's Motion to Suppress is now ripe for recommendation to the United States District Judge. Upon consideration of Defendant's Motion, the Government's response, and the evidence and testimony adduced at the evidentiary hearing, the undersigned Magistrate Judge RECOMMENDS that Defendant's Motion to Suppress (Doc. 21) be GRANTED in part and DENIED in part.

## I.   FINDINGS OF FACT[1]

On the morning of October 31, 2017, at approximately 6:50 a.m., law enforcement officers went to Defendant's apartment in order to execute a state arrest warrant for Defendant. Tr. 1: 6, 19-20. The state arrest warrant was for a probation violation arising from a murder charge. Tr. 1: 6, 19-20. Officer Dustin Holt, an officer with the narcotics division of the Auburn Police Department assigned to the United States Marshal's Gulf Coast Regional Fugitive Task Force ("GCRFTF"), was part of the team executing the warrant. Tr. 1: 5-6. Officer Dion Robinson, an officer with the Macon County Sheriff's Office assigned to the GCRFTF, was also present at the time the arrest warrant was

---

[1]  The Court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

The undersigned makes the findings of fact within this section based upon the June 6th and July 16th hearings. For the sake of clarity, the undersigned will cite to the June 6th transcript as "Tr. 1" and the July 16th transcript as "Tr. 2."

executed. Tr. 2: 10. In total, there were eight to eleven members of the GCRFTF that executed the arrest warrant. Tr. 1: 14.

Upon assembling at the door to Defendant's apartment, the officers knocked and announced. Tr. 1: 6. One of the officers observed movement from the blinds of what was believed to be a bedroom window. Tr. 1: 7; Tr. 2: 11. Defendant's long-term girlfriend Shakea Green opened the door and the officers pulled her out of the apartment. Tr. 1: 6-7; Tr. 2: 11-12. Officers asked her where Defendant was located. Tr. 1: 6-7. According to Holt and Robinson, Green stated that Defendant was in the back bedroom, but Green denies making that statement and being questioned by officers as to Defendant's whereabouts within the apartment. Tr. 1: 6-7; Tr. 2: 82. Robinson and another officer remained with her outside of the apartment while the other officers entered the apartment in a tactical stack formation to apprehend Defendant. Tr. 2: 17, 20, 40, 45.

A.  The Testimony Regarding the Layout of the Apartment[2]

Defendant's apartment is a two-bedroom apartment. (Doc. 81-3) at 2. Upon entering the apartment, there is a foyer with a small closet. *Id*. The foyer leads into a living room and dining room, which are open and connected. *Id*.; Tr. 1: 61. A kitchen is found off the dining area. (Doc. 81-3) at 2. A hallway leads from the open living room and dining room into a master bedroom, which contains a master bathroom within. *Id*. Prior to reaching the

---

[2] At the beginning of the July 16th hearing, the parties stipulated to a floorplan produced from Defendant's apartment complex's internet site that purportedly represented the layout of Defendant's apartment. Tr. 2: 5-6; 8-9; *see* (Doc. 81-3) at 2. However, during the hearing, it became apparent that the floorplan produced was "flipped," for lack of a better description, making the rooms that are on the left side of the apartment appear on the right side of the printout. Tr. 2: 11-12. Therefore, Defendant withdrew his stipulation that the document represented the layout of his apartment. Tr. 2: 12-16. Accordingly, the undersigned does not consider the printout he observed during the proceeding to be the actual floorplan of Defendant's apartment. Nonetheless, the undersigned does consider the printout only for the purpose of noting the general orientation of the rooms of the apartment.

3

master bedroom, a second bedroom and second bathroom are located off the hallway. *Id*. The master bedroom is separated by walls from the living room area of the apartment, *id*.; therefore, one cannot see into the master bedroom from the foyer or the living room area. Tr. 1: 19, 61-63.

For purposes of this recommendation, the undersigned considers the "rear area" of Defendant's apartment to include the hallway, the second bedroom, the second bathroom, the master bedroom, and the master bathroom. The undersigned considers the "front area" of Defendant's apartment to include the living room, the dining room, the kitchen, and the foyer.

### B. The Location of Defendant's Arrest

The Government contends that officers arrested Defendant in the master bedroom or rear area of the apartment while Defendant contends that officers arrested him in the foyer or living room area of the apartment. The undersigned sets forth below the evidence received at the hearings regarding this issue, and makes the following finding of fact as to the location of Defendant's arrest.

1. Testimony that Officers Arrested Defendant in the Master Bedroom or Rear Area of the Apartment.

Holt originally testified that he apprehended Defendant in the back bedroom of the apartment. Tr. 1: 7. Holt recounts that Defendant was cuffed, patted down for weapons, and moved to the living room area after the arrest. Tr. 1: 9. Holt conceded, however, during cross-examination that his memory regarding the location of Defendant's arrest may be incorrect and that Defendant could have been arrested in the living room area instead of

4

the back bedroom.[3] Tr. 1: 14-15. Holt did not complete a written report after the arrest. Tr. 1: 14.

Robinson testified that officers arrested Defendant in the rear area of the apartment. Tr. 2: 18-21. Robinson was standing outside the apartment with Green and bases his testimony upon what he could and could not hear going on inside the apartment. Tr. 2: 18-22. Specifically, Robinson testified that he saw officers in the tactical stack move into the apartment and heard them yell "clear" as they cleared the foyer and closet behind the front door, the living room, the dining room, and the kitchen. Tr. 2: 18-20, 59. Robinson testified that he could hear officers giving commands to Defendant immediately after hearing them clear the dining room. Tr. 2: 20. Based upon what he heard, Robinson concluded that "the only thing left [in the apartment] was the hallway," so he knew that officers were "talking to someone down at the end of the hallway" when they gave the verbal commands. Tr. 2: 20. After hearing these verbal commands, Robinson heard the officers state over the radio that Defendant was in custody. Tr. 2: 21.

In addition to what he heard at the scene, Robinson also testified that he spoke with other officers who were present during Defendant's arrest—namely Holt and Task Force Officer Sims—who told him that Defendant was arrested in the back bedroom of the

---

[3] During cross-examination, it was suggested to Holt by Defendant's counsel that one of the written reports indicated that Defendant was found immediately behind the door in the living room—not in the bedroom. Tr. 1: 14. Holt testified that he would not have reason to dispute that statement, and that he could have been mistaken as to the location of Defendant's arrest. Tr. 1: 14-15. The written report that purportedly placed Defendant's arrest site in the living room was not introduced into evidence at the June 6th or July 16th hearings.

apartment. Tr. 2: 27-28. Robinson did not complete a written report after the arrest.[4] Tr. 2: 41. Robinson did, however, later write a case summary regarding Defendant's arrest as part of his job as a special agent with the Alabama Law Enforcement Agency ("ALEA").[5] *See* (Doc. 81-3) at 3-7. In the case summary, which was created after Robinson met with the Government to discuss whether Defendant's case would be presented to the Grand Jury,[6] Robinson's case summary states that Defendant was arrested "in the hallway connected to the rear bedroom." *Id*. at 4.

2. <u>Testimony that Defendant Was Arrested in the Foyer or Living Room Area of the Apartment.</u>

Green testified that she and Defendant were in the living room when officers knocked on the apartment door. Tr. 2: 81-82. On direct examination, Green testified that, when she opened the door and was pulled from the apartment, Defendant was behind her in the living room. Tr. 2: 82. Green acknowledged that, because she was removed from the apartment almost immediately, she could not actually see Defendant in the living room when the officers entered. Tr. 2: 81-82. She also admitted that she did not see Defendant's actual arrest. Tr. 2: 82. However, she believes it impossible for Defendant to have been arrested in an area of the house other than the living room. Tr. 2: 90. She bases this knowledge upon her observation that, when officers grabbed her, she was pushed

---

[4] Robinson was not the leader of the task force team; therefore, it does not appear that it would have been standard protocol for him to write a report. Tr. 2: 41.

[5] Robinson is no longer with the Macon County Sheriff's Office and has been with ALEA for approximately one year. Tr. 2: 10.

[6] The undersigned notes that Robinson met with the Government in September 2018 regarding whether the case would be presented to the Grand Jury. (Doc. 81-3) at 3.

backwards momentarily and "could feel [Defendant] behind [her]." Tr. 2: 88-91. She also states that, as she was detained outside of the apartment, she was able to hear Defendant's voice the entire time. Tr. 2: 91.

Matthew Kidd, Defendant's former attorney for the state court proceedings against him, testified that, based upon his investigation of Defendant's state court probation revocation, it was his impression that Defendant was arrested in the living room area of the apartment. Tr. 2: 66-68. Kidd could not recall whom he spoke with regarding the facts of Defendant's arrest that led him to form this impression. Tr. 2: 74.

### 3.  Testimony Regarding the Location of the Drug Evidence

Holt testified that, as he was making his way to the back bedroom to arrest Defendant, he noticed what appeared to be a crystallized substance lying on the floor of the hallway. Tr. 1: 8. He further stated that he observed a similar substance on the floor of a bathroom, which was located on the right side of the hallway. Tr. 1: 8.

Angel Rodriguez, a special agent with the ALEA narcotics division who was called to process the potential narcotics observed in Defendant's apartment, testified that, upon his arrival at the scene, he was directed to the master bedroom, where he observed on the floor what he believed to be methamphetamine. Tr. 1: 29. Rodriguez also observed and retrieved what he believed to be methamphetamine from the toilet in the master bathroom. Tr. 1: 30.

Robinson testified that he observed narcotics on the floor of the master bedroom, trailing into the master bathroom inside the toilet. Tr. 2: 22-23.

The undersigned finds as a matter of fact that the methamphetamine was located on the floor of the master bedroom, the master bathroom, and in the master bathroom toilet. The undersigned reaches this conclusion based upon the testimony of Robinson and, particularly, Rodriguez. Because Rodriguez collected the methamphetamine—including the methamphetamine found in the toilet—the undersigned finds it likely that Rodriguez accurately recalls its locations. Coupling this with the fact that Rodriguez's testimony is supported by Robinson's testimony, the undersigned finds that Holt's testimony that the methamphetamine was located on the floor of the hallway and hallway bathroom inaccurate.

### 4. Location of Defendant's Arrest

The undersigned finds, based upon the preponderance of the evidence presented at the hearings, that officers arrested Defendant in the rear area of the apartment. The undersigned reaches this conclusion from the testimony of Holt and Robinson, as well as the location of the drug evidence. Robinson testified that, although he could not see into the apartment, he could hear the officers clearing individual rooms, including the living room, the dining room, the foyer, and the closet behind the front door. Robinson testified that he heard officers give Defendant commands *after* they had cleared these rooms. Had Defendant been arrested in one of these rooms, Robinson would have heard officers give Defendant commands instead of indicating that the room was clear.

Further, Robinson's testimony lends credibility to Holt's original testimony that Defendant was arrested in the back bedroom. Of course, the undersigned cannot overlook the fact that Holt, upon being told that Defendant possessed a report indicating that the

8

arrest occurred in the living room area, questioned his memory and conceded that he could have been mistaken. However, it is notable that this report was not shown to Holt or any other witness, nor was it introduced into evidence. Thus, the undersigned can merely speculate as to its actual existence and what it states about the location of Defendant's arrest.

Additionally, the undersigned notes that both Holt and Robinson testified that officers asked Green where Defendant was located, and she informed them that he was in the back of the apartment. Notably, Green denies that she was asked that question and that she ever made that statement. However, the undersigned finds Holt's and Robinson's testimony credible as to Green's statement, particularly considering that it aligns with their testimony that Defendant was arrested in the master bedroom and/or the rear of the apartment.

Finally, the location of the drug evidence also informs the undersigned's finding concerning the location of Defendant's arrest. Drug evidence was discovered in the toilet and on the floor of the master bedroom. From this evidence, the undersigned draws the reasonable conclusion that when the GCRFTF officers knocked and announced, someone inside the apartment tried to flush the drugs. Only two people were in the apartment: Defendant and Green. Green opened the front door when officers knocked. Therefore, the undersigned finds that Defendant was in the master bathroom flushing the drugs sometime after the officers knocked. This further supports the testimony that Defendant was arrested in the rear of the apartment, not the living room.

To be sure, Defendant, through the testimony of Green and Kidd, presented evidence that he was arrested in the living room. However, for the reasons discussed below, this evidence is not credible and/or unreliable.

First, the undersigned does not find Green's testimony credible or reliable. Green is in a long-term romantic relationship with Defendant and was in that relationship at the time of Defendant's arrest. Tr. 2: 85. It is clear that she cares for Defendant and has an interest in the outcome of this proceeding.

Additionally, the undersigned notes that Green testified that she did not observe Defendant's actual arrest, nor did she witness anything that occurred after she was removed from the apartment. Thus, Green cannot say for certain where Defendant was arrested. At most, she can say that he was *in* the living room and/or behind her as she answered the door, but she cannot say that Defendant was actually *arrested* in the living room.

Further, the undersigned is troubled by Green's evasive behavior on the witness stand when questioned by the prosecutor regarding how it came about that she would testify at the reconvened hearing on Defendant's behalf. Green testified that she first learned of the reconvened hearing approximately one week prior to July 16th; however, when questioned about how she came to testify, Green could not recall anything. Tr. 2: 87. She indicated that she "ha[s] a lot going on, so [she] really can't just remember." Tr. 2: 87. Green also denied having knowledge about the purpose of the hearing and about the issues that her testimony would address. Tr. 2: 85-87. She testified that, while she had spoken with Defendant and knew that he had to go to court, they had not discussed what she would testify about. Tr. 2: 85-87. Nor had she discussed the purpose of the hearing with any other

10

individual. Tr. 2: 85-88. This seems odd to the undersigned. Indeed, without knowledge from some source regarding the purpose of the hearing, how would Green have known that her testimony was relevant and therefore needed? Green's less-than-forthcoming answers to these and other questions during cross-examination is concerning to the undersigned, particularly considering the one-hundred-eighty-degree shift in her demeanor during direct examination when she testified with certainty and confidence regarding the location of Defendant's arrest.

It is clear that Green has an interest in the outcome of this proceeding based upon her long-term, ongoing romantic relationship with Defendant. Combined with the undersigned's observations of her demeanor on the stand, her evasiveness during cross-examination, and her acknowledgment that she did not witness Defendant's arrest, the undersigned does not find her testimony that Defendant was arrested in the living room area credible or reliable.

Second, the undersigned does not find Kidd's testimony reliable regarding the location of Defendant's arrest. When asked on direct examination about his knowledge of where Defendant was arrested, Kidd replied: "I will say this: During the course of my investigation [for Defendant's state court case], drawing from all the sources that I talked to, I was never under the impression that [Defendant] was anywhere other than somewhere close to the couch in the living room at the time of entry." Tr. 2: 66. He further stated: "What I can say from my notes, I'm 100 percent confident that the only information that I had ever received about where [Defendant] was in that apartment was somewhere within

the confines of the living room." Tr. 2: 74. When questioned regarding from whom he received that information, Kidd was unable to identify his sources. Tr. 2: 73-75.

While the undersigned certainly respects Kidd's ability to competently investigate and analyze the pertinent facts of his cases, Kidd's inability to recall the sources from whom he obtained information regarding the location of Defendant's arrest raises concerns with the undersigned as to the reliability of those statements. If the undersigned were to credit Kidd's impression of where Defendant was arrested, the undersigned would be relying upon the statements of unknown individuals who relayed information to Kidd in the course of Kidd's investigation. Clearly, such reliance would not be sound because the undersigned (1) has no way to determine the basis upon which those unknown individuals possessed information regarding the location of Defendant's arrest, and (2) has no way to examine whether those individuals had an interest in the location of Defendant's arrest that could motivate their statements to Kidd. Further, it is notable to the undersigned that Kidd did not testify that someone explicitly told him that Defendant was arrested and/or encountered in the living room of the apartment; instead, Kidd merely stated that he never received information otherwise. Therefore, for these reasons, the undersigned finds Kidd's testimony regarding his impressions of where Defendant was arrested unreliable.

In summary, then, the undersigned finds, based upon the preponderance of the evidence presented at the hearings, that Defendant was arrested in the rear of the apartment. Notably, the undersigned does not find that the preponderance of the evidence shows that Defendant was arrested in the master bedroom. Indeed, although Holt testified to such, he later conceded that he could be incorrect about the location of Defendant's arrest. And,

12

Robinson cannot testify, based upon his personal knowledge, that Defendant was arrested in the master bedroom instead of the hallway. Instead, Robinson can only testify that Defendant was arrested in the rear area of the apartment and not in the living room, dining room, kitchen, or foyer. Accordingly, the undersigned concludes that the preponderance of the evidence shows that Defendant was arrested in the rear of the apartment, and nothing more.

C. Testimony Regarding the Events Transpiring After Defendant's Arrest

Officers entered Defendant's apartment at approximately 6:50 a.m. and arrested Defendant shortly thereafter. Tr. 1: 21. Subsequent to Defendant's arrest, the entire apartment was cleared, according to Holt, for officer safety. Tr. 1: 9. Rodriguez testified that he was contacted at approximately 6:50 a.m. concerning the potential illegal narcotics, and that he arrived at Defendant's apartment to process the scene at approximately 7:00 a.m.[7] Tr. 1: 28. Rodriguez photographed the contraband he observed, and collected the following: a substance he believed to be marijuana, a digital scale, suspected methamphetamine particles on the floor of the residence, suspected methamphetamine in the toilet, and at least one cell phone. Tr. 1: 30-31. One of the photographs Rodriguez took of a cell phone shows a picture of scales and narcotics on the cell phone's screen. Tr. 1: 66. It is uncontested that the cell phone had been moved from its original location at the time

---

[7] Rodriguez noted that the distance between his office and Defendant's apartment was approximately five to ten minutes, and he testified that he was likely already at his office that morning because he had received a "heads up" that an arrest warrant would be served. Tr. 1: 28.

the photograph was taken, but Rodriguez testified that he did not manipulate the phone or push any buttons in order to make the picture appear. Tr. 1: 66-67.

Rodriguez was also informed that a key fob, found at the apartment by Holt, activated a vehicle outside of Defendant's apartment. Tr. 1: 37. Holt testified that he had observed a key fob on the kitchen counter after Defendant's arrest. Tr. 1: 10. He asked Defendant and Green if either had a vehicle onsite, and both denied. Tr. 1: 10, 12. Holt picked up the key fob, stepped outside the door of the apartment, pressed the lock button, and heard a horn activate. Tr. 1: 10, 12. Holt located the vehicle—a Nissan Altima— through use of the key fob and conveyed that information to other officers. Tr. 1: 10, 12. Prior to activating the horn, Holt had no reason to believe that the vehicle was connected to the apartment or Defendant in any way. Tr. 1: 25-26.

Rodriguez also used the key fob to activate the horn of the Altima so that he could record the tag number and the vehicle identification number in his affidavit in support of a search warrant for Defendant's apartment and the vehicle. Tr. 1: 31-32, 70. Rodriguez included the information regarding the vehicle within his affidavit because he believed that the quantity of drugs found inside the apartment suggested that the drugs were for more than personal use. Tr. 1: 36.

At 9:20 a.m., Rodriguez obtained a search warrant for the apartment and the Altima from a Montgomery County District Judge. Tr. 1: 33-34, 52-53. Rodriguez seized methamphetamine, pills, currency, multiple guns, plastic bags, digital scales, and cell phones from the apartment and the Altima. (Doc. 60-2) at 8-11. While he was conducting his search, Defendant indicated that he wished to speak to Rodriguez. Tr. 1: 35, 58.

14

Rodriguez testified that, during that conversation, Defendant stated that he would provide officers with the source of the supply of the narcotics if he and Green were released. Tr. 1: 35.

## II.   DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures[.].   U.S. Const. amd. IV.   The Supreme Court instructs that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (internal quotes and citation omitted).   An arrest warrant provides "the limited authority to enter a dwelling in which the suspect lives" to effect his arrest but does not authorize further search.   *Id.* at 603.   Any further search is presumptively unreasonable unless justified by an exception to the warrant requirement, and the Government bears the burden of demonstrating that an exception applies.   *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

### A.   The Evidence Seized Prior to the Officers Obtaining a Search Warrant.

Here, the Government argues that the drug evidence seized prior to officers obtaining a search warrant was legally obtained based upon two theories. First, the Government argues that the evidence was observed in plain view as officers apprehended Defendant in the master bedroom. (Doc. 37) at 3. Alternatively, the Government argues that the evidence was observed in plain view during a protective sweep of the apartment, which was based upon the officers' reasonable suspicion that the apartment harbored an

individual that posed a danger to them and/or that the location of the contraband was immediately adjoining Defendant's place of arrest. (Doc. 80) at 1-8.

### 1. Plain View

The undersigned turns first to the Government's position that the evidence seized prior to obtaining a search warrant was in plain view as officers attempted to locate and arrest Defendant pursuant to an arrest warrant.

Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993); *United States v. Purcell,* 236 F.3d 1274, 1277 (11th Cir. 2001) (Officers "may seize any contraband, including weapons, in plain view."). The theory of the plain-view doctrine is that, "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." *Dickerson,* 508 U.S. at 375; *see also O'Rourke v. Hayes,* 378 F.3d 1201, 1208 (11th Cir. 2004) (noting that no search and thus no Fourth Amendment violation occurred when an officer used his eyes in a place where the officer has the right to be).

Here, whether the plain view doctrine applies hinges upon whether the officers arrested Defendant in the master bedroom. As noted above, the undersigned cannot find, based upon the preponderance of the evidence, that Defendant was arrested in the master

bedroom. Instead, the undersigned can only find that Defendant was arrested in the rear of the apartment. Therefore, because the Government has not shown that officers were lawfully within the master bedroom for the purpose of arresting Defendant, the undersigned finds that the plain view doctrine cannot justify the seizure of the evidence found in the master bedroom and master bathroom.

### 2.  Protective Sweep

The Government alternatively argues that officers were lawfully within the master bedroom pursuant to a protective sweep. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494 U.S. 325, 327 (1990). Under *Buie*, such a sweep may be performed in two scenarios. First, a limited protective sweep is justified incident to arrest "as a precautionary matter and without probable cause or reasonable suspicion." *Id.* at 334. This routine sweep allows officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id*. Second, a full protective sweep is justified when officers possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. In either case, the sweep must last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises. *Id*. at 335-36. Further, the search must be limited to those places where a person could be and does not extend to places where evidence, but not persons, might be found. *Id*. at 335.

The inquiry into whether a search qualifies as a protective sweep is "a very fact-specific one" and should be "assessed carefully in light of the overarching policy concerns articulated in *Buie*." *United States v. Burrows,* 48 F.3d 1011, 1016 (7th Cir. 1995). The facts should be "assessed from the perspective of the officer on the scene" as it is the "reasonableness of the officer's judgment at the time he was required to act that counts." *Id.* Factors the Court should evaluate include the "particular configuration of the dwelling, characteristics of those known to be present and who might be present," and the "general surroundings, especially its history in previous law enforcement efforts." *Id.*

Contraband discovered during a properly conducted protective sweep of a residence may be seized without a warrant under the plain view doctrine. *United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991); *see also United States v. Hromada,* 49 F.3d 685, 690 (11th Cir. 1995) ("If an officer has lawfully executed a valid arrest warrant, he is not required to shut his eyes to contraband in plain view in order to accommodate the arrestee's desire to avoid further charges."). However, the "incriminating character" of the item to be seized must be "immediately apparent." *Horton v. California*, 496 U.S. 128, 136 (1990).

### i.   *Buie I*[8]

The Fourth Amendment authorizes officers to perform—incident to an arrest—a limited protective sweep to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" "as a precautionary

---

[8] For purposes of this Recommendation, the undersigned will refer to the first type of permissible sweep under *Buie*—i.e., a limited search allowing officers to "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" "as a precautionary measure and without probable cause or reasonable suspicion"—as a *Buie I* search.

measure and without probable cause or reasonable suspicion." *Buie*, 494 U.S. at 327. There is no "bright-line" rule for determining which spaces are "immediately adjoining the place of arrest" and thereby searchable under *Buie I*; instead, the determination is made on a case-by-case basis. *See United States v. Porter*, 2018 WL 4214189, at *7 (M.D. Ala. Aug. 9, 2018) (citing, e.g., *United States v. Archibald*, 589 F.3d 289, 298 (6th Cir. 2009) (where defendant arrested on porch, the "immediately adjoining" area was the living room situated inside the door, but not the more distant kitchen and upstairs bedroom); *United States v. Thomas*, 429 F.3d 282, 287 (D.C. Cir. 2005) (where defendant arrested "in the hallway immediately inside his front door," search of entire apartment justified because every room swept "could be immediately accessed from the hallway")).

In determining whether a protective sweep falls under *Buie I*, courts consider "the particular configuration of the dwelling." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) (stressing "officers were in a confined space; the basement was not well lit; the area contained a partial wall dividing the space into at least two areas"). Ultimately, the "safety of the officers, not the percentage of the home searched, is the relevant criterion." *Thomas,* 429 F.3d at 287.

As explained more fully above, the undersigned finds that Defendant was arrested in the rear area of the apartment. For purposes of this analysis, the undersigned will afford Defendant the most leeway under the protective sweep doctrine—i.e., the undersigned will assign the site of Defendant's arrest to be the farthest location away from the master bedroom but still in the rear area of the apartment. The farthest location from the master bedroom that is still within the rear area of the apartment is the mouth of the hallway that

opens into the front area of the apartment. From that location, the hallway leads directly to the master bedroom, separated only by the doors to a separate bedroom and a separate bathroom.

Based upon these facts and observations, the undersigned finds that the master bedroom of the apartment is immediately adjoining the mouth of the hallway. The undersigned bases this finding upon the fact that the entrance to the master bedroom was separated from the mouth of the hallway by only the entrance to one bedroom and one bathroom. Further, the fact that the mouth of the hallway was directly connected—with no twists or turns—to the entrance of the master bedroom means that an attack could be immediately launched from that space. Therefore, the undersigned concludes that officers were allowed to search the master bedroom pursuant to a *Buie I* protective sweep. *See Thomas,* 429 F.3d at 287 ("Because the entrance to the bedroom was a straight shot down the hallway from the spot where Thomas was arrested, the bedroom was a place immediately adjoining the place of arrest from which an attack could be immediately launched.") (internal quotations omitted); *United States v. Ford*, 56 F.3d 265, 267, 270 (D.C. Cir. 1995) (holding that officers' search of the defendant's bedroom was permissible under *Buie I* because the bedroom, from which the defendant emerged prior to his arrest, was located down a "short hallway" where the defendant was arrested); *United States v. Davis,* 906 F. Supp. 2d 545, 552 (S.D.W.V. 2012) (concluding that the officers' "cursory check of the rooms immediately adjoining where Defendant was arrested" was authorized under *Buie I* as an initial protective sweep where the defendant was arrested in an interior hallway adjoining the living room, bathroom, and two bedrooms); *United States v.*

*Robinson,* 775 F. Supp. 231, 232 (N.D. Ill. 1993) (holding a protective sweep of a bedroom valid because the defendant's arrest was made at the mouth of an interior hallway leading to the bedroom). Once in the master bedroom, any contraband officers observed in plain view could be legally seized.[9]

With that said, however, the undersigned notes that some of the evidence seized by officers from the master bedroom—namely any and all cell phones seized prior to officers obtaining a search warrant—does not fit within the confines of "contraband" as contemplated within a protective sweep. As noted above, in order for officers to legally seize evidence during a protective sweep, the "incriminating character" of the item to be seized must be "immediately apparent." *Horton*, 496 U.S. at 136. The undersigned finds that, unlike crystallized substances on the floor and in the toilet or green, leafy substances on the bed, it is not "immediately apparent" that a cell phone is incriminating. Thus, the undersigned finds that the seizure of any cell phones prior to officers obtaining a search warrant for the apartment was not permissible under the protective sweep doctrine and should be suppressed, along with the photograph taken of the cell phone displaying a picture of drugs and scales.[10] *See United States v. Jackson*, 155 F. Supp. 3d 1320, 1333

---

[9] The undersigned notes the concern raised by Defendant that Holt's testimony suggests that the apartment was swept seemingly as a matter of course after Defendant's arrest. The undersigned agrees that officers are not allowed to automatically sweep an entire dwelling under the guise of a *Buie I* protective sweep after arresting a defendant. Thus, to the extent that Holt's testimony indicates that a policy is in place that officers perform complete searches of residences after an arrest, such a policy is misplaced.

[10] The undersigned notes that the Government has not argued that the inevitable discovery exception applies. In order for the undersigned to apply the inevitable discovery exception, the prosecution must "establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means[.]" *Nix*, 467 U.S. at 434. Because the Government did not argue the exception, the undersigned declines to apply it *sua sponte*.

(S.D. Fla. April 16, 2014) (suppressing cell phones found as part of a protective sweep where there was no evidence or testimony pointing to the incriminating nature of the cell phones).

Notably, however, the affidavit in support of the subsequent search warrant to search Defendant's apartment and his vehicle did not rely upon the discovery of the cell phone as a basis for probable cause. Therefore, the evidence obtained as a result of the search of Defendant's apartment and the Altima after the search warrant was executed is not tainted by the illegal seizure of the cell phone.

### a. Buie II[11]

Although the undersigned has concluded that officers were legally within Defendant's master bedroom pursuant to *Buie I*, the undersigned will still address the Government's argument that the search of the master bedroom was permissible under *Buie II*.

The Fourth Amendment permits protective sweeps "if the searching officer 'possesse[d] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing,' that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327 (internal citations omitted). "A mere lack of information about who or what is inside a building is not enough to justify a protective search of that

---

[11] For purposes of this Recommendation, the undersigned will refer to the second type of permissible sweep under *Buie*—i.e., a search based upon "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene"—as a *Buie II* search.

building." *United States v. Reynolds*, 526 F. Supp. 2d 1330, 1339 (N.D. Ga. 2007) (citing *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (holding that protective sweeps may not be carried out on the strength of an "inchoate and unparticularized suspicion or hunch")); *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004) (noting that "there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course[.]"); *United States v. Roof*, 103 F. App'x 652, 658 (10th Cir. 2004) ("A mere absence of information about whether anyone remains in a home does not justify a protective sweep."); *United States v. Yarbrough*, 2018 WL 317711, at *6 (N.D. Ala. Jan. 8, 2018) (holding that the Government did not satisfy their burden to prove that the protective sweep exception applied where the officers did not testify that "they actually believed anyone other than Mrs. Yarbrough was inside the house"; instead, the closest they came was agreeing with the prosecuting attorney's suggestion that "someone could possibly be inside the home still").

The undersigned finds two facts that potentially support a *Buie II* search. First, officers knew they were serving an arrest warrant for Defendant for a probation revocation that related to an underlying murder charge.[12] Second, upon arrival at the apartment, officers observed the blinds of a window being manipulated. Notably, it does not appear that, prior to entering the apartment, officers possessed any specific information—based

---

[12] The undersigned notes that Defendant asserts that the underlying murder charge was "old." Tr. 1: 18, 110. However, Defendant has presented no case law that would lead the undersigned to believe that an "old" murder charge would negate officers' consideration that they were dealing with a potentially dangerous individual when they entered the apartment to arrest him.

upon surveillance, case briefing, etc.—that anyone other than Defendant was inside. Tr. 1: 14. Nor is there evidence that, once inside the apartment, officers observed anything that would lead them to conclude that anyone other than Defendant and Green were present.

Simply put, these facts in isolation and in combination are insufficient to justify a *Buie II* search. The undersigned turns first to address the articulable fact that officers knew, prior to entering the apartment, that Defendant had a previous murder conviction. This is important because, in determining whether officers may perform a *Buie II*-type sweep, a court may take into consideration whether the arrest warrant is for a violent offense. *See Porter*, 2018 WL 4214189, at *6. While officers would arguably have been justified in assuming that Defendant was a dangerous individual based upon the arrest warrant, it is unlikely that, *without more*, the arrest warrant alone would justify officers to conduct a *Buie II* search. *See United States v. Alatorre*, 863 F.3d 810, 812 (8th Cir. 2017) (affirming protective sweep based on articulable facts including the defendant's criminal history of gun possession *and* circumstances indicating additional people were inside the home); *United States v. Biggs*, 70 F.3d 913, 196 (6th Cir. 1995) (affirming "warrantless search of a motel room 20-75 feet from the arrest site" based on articulable facts including the defendant's previous firearm possession *and* a tip that he would be meeting someone at the motel).

Thus, the undersigned turns to the second articulable fact—i.e., the fact that, prior to entry, an officer observed someone manipulating the blinds of a window in the apartment—to determine if it is the "more" needed to justify a *Buie II* search. The undersigned concludes that it is not. The manipulation of window blinds clearly indicates

24

to officers that someone is located inside that particular area of the apartment. However, manipulation of blinds does not indicate that the person who is doing the manipulation is dangerous, or even that the person is someone other than Defendant. Without articulable facts to indicate that the hypothetical individual manipulating the blinds is someone other than Defendant *and* is a danger to officers, a *Buie II* search is not permissible.

### 3. Conclusion

The undersigned finds that the search of Defendant's master bedroom was permissible pursuant to *Buie I*. Therefore, the drug evidence that was seized as a result of the officers' protective sweep did not violate Defendant's Fourth Amendment rights and should not be suppressed. However, the cell phones seized as part of the protective sweep should be suppressed because their "incriminating" nature was not "immediately apparent."

## B.   Whether the Use of the Key Fob to Identify Defendant's Vehicle Violated the Fourth Amendment.

Assuming that use of the key fob to identify Defendant's vehicle constituted a search or seizure, it was justified (1) because it was reasonable under the Fourth Amendment, and/or (2) by the automobile exception.

### 1. Under the Totality of the Circumstances, Officers' Use of the Key Fob to Identify Defendant's Vehicle Was Reasonable.

In *United States v. Dasinger*, 650 F. App'x 664 (11th Cir. 2016) (unpublished), the Eleventh Circuit examined whether the handling of a key fob by an officer, which ultimately led to the discovery of evidence within a vehicle, was an unlawful search or seizure. The facts of *Dasinger* are as follows.

Stephanie Dasinger and her boyfriend, Jefferson Patterson, were methamphetamine dealers. *Dasinger*, 650 F. App'x at 666. In October 2013, Dasinger and Patterson borrowed a car from a friend and drove to a motel where they purchased methamphetamine. *Id*. Their acquaintance, James Lloyd, had rented two rooms in the motel. *Id*. at 666-67. Dasinger and Patterson occupied one of those rooms, and Lloyd the other. *Id*. The next day, Lloyd was pulled over by troopers in the parking lot of the motel, and illegal narcotics were discovered in his vehicle. *Id*. Lloyd told officers that he had rented one room at the motel. *Id*. at 667. Officers requested to search the room, and Lloyd consented. *Id*. Officers found a small amount of drugs in that room. *Id*.

Meanwhile, Patterson and Dasinger learned that police were in the area, so they hid the methamphetamine in a backpack, and placed the backpack in Dasinger's car, which was borrowed from a friend. *Id*. They had scales and plastic bags in the motel room, which they hid under the bed. *Id*. While officers were searching Lloyd's room, motel employees told them that Lloyd had also rented a second room. *Id*. Lloyd gave officers consent to search that room as well. *Id*.

When officers entered the second room that had been occupied by Dasinger and Patterson, they observed clothing and a computer, and two sets of car keys on the nightstand. *Id*. Dasinger and Patterson identified their belongings as one bag of clothes but did not claim the keys. *Id*. They informed officers that they had been dropped off at the motel. *Id*. During questioning, Patterson admitted that they had smoked marijuana in the motel room. *Id*. Officers subsequently searched the room and found evidence of the

marijuana in an ashtray on the nightstand. *Id*. They also found the scales and plastic bags in the room, along with a large wad of cash on Patterson's person. *Id*.

During the search of the motel room, an officer became interested in the car keys, which he thought were out of place considering that Dasinger and Patterson denied having a car on the premises. *Id*. Although she previously failed to claim ownership of the keys, Dasinger admitted that the keys were hers and Patterson's, but claimed neither car was on the premises. *Id*. at 668. Skeptical, the officer picked up one set of keys, pressed a button on the key fob, and heard an alert from outside the room. *Id*. Dasinger then said that she had borrowed a friend's car and driven it to the motel but had not wanted to tell officers because she had no driver's license. *Id*.

Officers asked Dasinger if they could search the car, but she declined. *Id*. A drug detection dog was shown the vehicle, and he alerted. *Id*. Officers opened the trunk of the vehicle and discovered methamphetamine, a gun, and some cash. *Id*. Dasinger and Patterson were subsequently arrested. *Id*.

On appeal, Dasinger argued that the district court erred in denying her motion to suppress the evidence in the vehicle because it was found, in relevant part here, as a result of an unconstitutional seizure of her keys. *Id*. at 670. In disposing of Dasinger's argument, the Eleventh Circuit assumed, for purposes of the analysis, that the "handling of the keys and key fob was a search or seizure under the Fourth Amendment." *Id*. at 671. The Circuit then found that the handling of the key fob was outside the scope of Lloyd's consent to search for illegal narcotics. *Id*. After so determining, the Circuit focused its inquiry on whether the handling of the keys and key fob was reasonable under the Fourth Amendment.

27

*Id*. (citing *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999)). Ultimately, the Circuit determined that, under the totality of the circumstances, the manipulation of the keys and key fob was not an unreasonable search or seizure in violation of the Fourth Amendment. *Id*. In so concluding, the Circuit noted that, to the extent Dasinger had a privacy interest in the identity of the car she borrowed from her friend,[13] "the interest was outweighed by the officers' legitimate interest in investigating the signs of criminal activity." *Id*. The Circuit reasoned that, prior to pressing the key fob, officers knew that drugs had been found in the motel rooms and Lloyd's car, and they had observed other signs of drug distribution, including scales and plastic bags. *Id*. Further, officers were suspicious about Dasinger's statement that she had no vehicle on the premises particularly considering that two sets of car keys were observed on the nightstand. *Id*. Thus, the Circuit found that "in light of the inconsistency and evidence that a drug operation was afoot, and in particular that drugs had been found . . ., [the officers'] minimal intrusion into Dasinger's privacy—holding her keys a few seconds and clicking on the key fob to test the accuracy of Dasinger's story—did not violate the Fourth Amendment." *Id*.

Here, the use of the key fob is outside the scope of the protective sweep. Like the cell phone, the "incriminating" nature of a key fob is not "immediately apparent."

---

[13] The Circuit noted that "Dasinger's privacy interest in the identity of the car was not diminished simply because she had borrowed the car from a friend." 650 F. App'x at 672, n.8 (citing *United States v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987) (holding that the defendant had a legitimate expectation of privacy in a borrowed car). The Circuit further noted that "one generally has a 'diminished expectation of privacy in an automobile'" and that "[o]ther courts have held that a person has little or no reasonable expectation of privacy in the identity of his car." *Id*. (citing *United States v. Knotts*, 460 U.S. 276, 281 (1983) and *United States v. Cowan*, 674 F.3d 947, 955-57 (8th Cir. 2012) (holding that because the defendant lacked a reasonable expectation of privacy in the identity of his car, the use of a key fob attached to legally seized keys did not violate the Fourth Amendment)).

However, under the totality of the circumstances, the undersigned finds—as this Circuit did in *Dasinger*—that the use of the key fob was not an unreasonable search or seizure that violated the Fourth Amendment.

It is clear that the "ultimate touchstone of the Fourth Amendment is reasonableness[.]" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Courts must weigh "the degree to which [the search] intrudes upon an individual's privacy" against "the degree to which it is needed for the promotion of legitimate governmental interests." *Houghton*, 526 U.S. at 300.

In this case, officers observed drug evidence during a protective sweep of Defendant's apartment. The amount of drug evidence, according to Rodriguez, was not merely "user" quantity. Tr. 1: 36. Therefore, officers reasonably suspected that criminal activity was afoot—namely, drug sales. Further, Defendant and Green denied having a vehicle on the premises, which undoubtedly aroused Holt's suspicion considering that he observed a key fob on the kitchen counter. To the extent Defendant had a privacy interest in the identification of his car, that interest was outweighed by the officers' legitimate interest in investigating the signs of criminal activity. The undersigned reiterates that, prior to pressing the button on the key fob, both Holt and Rodriguez knew that drugs had been found in Defendant's apartment. They also knew that the quantity of drugs found suggested that is was for more than mere personal use. Holt knew that both Defendant and Green— the only individuals found inside the apartment—denied having a vehicle on the premises. Of course, this statement was suspicious considering Holt's observation of the key fob.

Thus, in light of the inconsistency and evidence that a drug operation was afoot, the officers' minimal intrusion into Defendant's privacy—i.e., clicking the key fob to determine if a vehicle was located outside the apartment—did not violate the Fourth Amendment. *See Dasinger*, 650 F. App'x at 672. Therefore, Defendant's request to suppress the evidence discovered in the vehicle should be denied.

### 2. Officers' Use of the Key Fob to Identify Defendant's Vehicle Was Also Justified Under the Automobile Exception.

The officers' use of the key fob to identify Defendant's vehicle was also justified under the automobile exception. In *United States v. Cowan*, 674 F.3d 947 (8th Cir. 2012), the Eighth Circuit concluded that, even if use of a key fob to locate a vehicle is a search or seizure, it is justified under the automobile exception.[14] The Eighth Circuit reasoned:

> 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.' *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996). This is because 'the overriding societal interests in effective law enforcement justify an immediate search before the car and its occupants become unavailable.' *California v. Carney,* 471 U.S. 386, 393, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). A similar interest justifies pressing a key fob button to locate a vehicle when officers have probable cause to believe the vehicle contains contraband or otherwise is involved in drug trafficking. Detective Canas had probable cause to believe the keys—if they belonged to a vehicle parked near the apartment—would lead the officers to an automobile containing contraband. During surveillance of the apartment, before executing the warrant, officers had observed two suspects sitting in vehicles outside the apartment. By the time Detective Canas removed the

---

[14] In addressing whether the use of the key fob was an unreasonable search or seizure, the Eighth Circuit made several relevant findings. First, that Circuit stated that the defendant "did not have a reasonable expectation of privacy in the identity of his car." *Cowan*, 674 F.3d at 954. Further, although the defendant argued that his privacy interest was in the key fob's electronic code, that Circuit found that argument unpersuasive. *Id.* at 955-56. Indeed, that Circuit noted that "[p]ressing the alarm button on the key fob was a way to identify the car and did not tell officers anything about the fob's code or the car's contents" and found that the defendant had not met his burden of articulating how officers' use of his key fob violated his reasonable expectation of privacy. *Id.* at 955.

keys from Cowan's pocket and discovered they were car keys, Cowan had stated he was from Chicago. Because the officers had information linking the apartment to crack cocaine brought from Chicago, Cowan's statement and his presence in the apartment gave Detective Canas reason to believe Cowan may have driven crack cocaine to the apartment from Chicago. The officers' discovery of crack cocaine in the apartment corroborated the informant's story and bolstered Detective Canas' probable cause. Cowan was carrying car keys but claimed he arrived by bus and further claimed the keys belonged to a Cadillac—which Detective Canas immediately recognized was false. These potential inconsistencies alerted Detective Canas to the probability Cowan was being untruthful, and gave Detective Canas further reason to suspect Cowan and his car were tied to drug trafficking. Detective Canas' actual use of the key fob was limited in time and scope and occurred in the apartment's associated parking areas. To the extent pressing the key fob button was a search and seizure, it was permissible under the automobile exception to the Fourth Amendment's warrant requirement because it was based on probable cause.

Here, Holt and Rodriguez had probable cause to believe that the keys—if they belonged to a car in the parking lot—would lead to a vehicle that contained contraband or was otherwise involved in drug activity. Holt and Rodriguez both testified that the quantity of drugs found in the apartment suggested more than personal use and that vehicles were often used in drug trafficking operations. Further, the fact that Defendant and Green denied having a vehicle on the premises certainly added to Holt's suspicion that the vehicle, if present, would contain evidence of illegal activity. Accordingly, the undersigned finds that, to the extent pressing the key fob button was a search and seizure, it was permissible under the automobile exception to the Fourth Amendment's warrant requirement because it was based on probable cause.

### 3. *Hicks v. Arizona* **is Distinguishable.**

To be sure, Defendant argues that the evidence should be suppressed, and points the Court to *Hicks v. Arizona*. In *Hicks*, the Supreme Court answered the question of whether the plain view doctrine "may be invoked when the police have less than probable cause to believe that the item in question is evidence of a crime or is contraband." 480 U.S. at 323.

The facts of *Hicks* are as follows. After a bullet was fired through the floor of Hicks's apartment, police officers entered the apartment to search for the shooter, victims, and weapons. *Id*. While there, officers noticed expensive stereo equipment, which seemed out of place in the squalid apartment. *Id*. Suspecting that the equipment was stolen, an officer manipulated the equipment so that he could record the serial numbers. *Id*. The officer radioed the numbers into headquarters and was advised that the equipment had been taken in an armed robbery. *Id*. He immediately seized that property. *Id*. It was later determined that some of the other serial numbers found on other pieces of stereo equipment matched those taken in the armed robbery. *Id*. A warrant was obtained to seize that equipment as well. *Id*. at 323-24.

The state trial court granted Hicks's motion to suppress the evidence, and the state appellate court affirmed. *Id*. at 324. Both courts rejected the State's argument that the officer's actions were justified under the plain view doctrine. *Id*. The Supreme Court determined that the "mere recording of serial numbers did not constitute a seizure" because it did not "meaningly interfere" with Hicks's possessory interest in either the serial numbers or the equipment." *Id*. The Court found, however, that the officer's "moving of the equipment did constitute a search separate and apart from the search for the shooter,

victims, and weapons that was the lawful objective of his entry into the apartment." *Id.* at 324-25. The Court concluded that taking such action produced "a new invasion of [Hicks's] privacy unjustified by the exigent circumstance that validated the entry." *Id*. at 325.

Having concluded that there was a search, the Court discussed whether it was reasonable under the Fourth Amendment. *Id*. at 325. Holding that probable cause is required before the police seize an item as part of the plain view doctrine, the Court ultimately determined that the search and ultimate seizure of the stereo equipment violated the Fourth Amendment. *Id*. However, the Court noted that it was not holding "that a seizure can never be justified on less than probable cause." *Id*. at 327. The Court pointed specifically to situations where "the seizure is minimally intrusive and operational necessities render it the only practicable means of detecting certain types of crimes." *Id*. Nonetheless, absent the considerations noted by the Court, the Court found that "the mere fact that the items in question came lawfully within the officer's plain view" "cannot supplant the requirement of probable cause." *Id*. The Court further explained that it would not erode the requirement of probable cause for a search instead of a seizure. *Id*. at 327-28.

The facts of this case are distinguishable from *Hicks*. Here, officers clearly observed evidence of illegal drug activity in Defendant's apartment when they swept the master bedroom. Based upon the quantity of drug evidence they observed, they had strong reason to believe that criminal activity was afoot. As Rodriguez testified, it is widely known that vehicles are often used in drug trafficking operations; thus, there was a nexus between the criminal activity and the vehicle. Therefore, when Defendant and Green denied having a vehicle on the premises, and when Holt observed the key fob, his suspicions were rightfully

aroused that Defendant and/or Green were being untruthful and hiding something within the vehicle. *Hicks* differs because that officer merely observed expensive stereo equipment that appeared out of place in an otherwise squalid apartment. Such an observation undoubtedly created reasonable suspicion that the items were stolen and that criminal activity was afoot. In contrast here, however, observing drug evidence on the floor and in a toilet clearly creates more than reasonable suspicion that criminal activity is afoot. Therefore, the undersigned finds this case distinguishable from *Hicks*, and the undersigned is not persuaded that *Hicks* requires suppression of the evidence found in Defendant's vehicle.

**C.    Whether the Affidavit for the State Court Search Warrant Provided Sufficient Probable Cause to Issue.**

Rodriguez obtained a search warrant from a state-court judge to search Defendant's apartment and the Altima. That search warrant was granted based upon the following affidavit:

> Based on your affiant's training and experience, he has probable cause to believe and does believe that methamphetamine and other items . . . are being sold, stored and/or concealed in the residence . . . as well as inside a 2013, white Nissan Altima, . . . parked outside the apartment.
>
> a)  Probable cause being; that on 10-31-2017, members of the U.S. Marshal Service (USMS) Gulf Coast Regional Fugitive Task Force, executed an arrest warrant of Kemond J. Fortson, at an apartment located at 7014 Watchman Circle, Apt G, Montgomery, Montgomery County, Alabama 36117 also known as Tapestry Apartments. The arrest warrant was signed on 09-21-2017, pursuant to a probation violation issued via the Macon County, Office of the Alabama Department of Pardons and Parole.
>
> b)  Probable cause being; that at the time of Fortson's arrest, Agents observed, in plain view, approximately 35 grams of an off-white, crystalized substance, that field tested positive to contain

34

methamphetamine. Said substance was found on the floor, leading from the master bedroom of the apartment, into the bathroom, and inside the toilet. Agents also located a small plastic bag containing approximately 3 ounces of a leafy material believed to be marijuana. Additionally, Agents also observed a set of Digitz brand digital scale.

c) Probable cause being; that while inside the apartment, Agents located an electronic key, that when activated, sounded the alarm to a 2013, white Nissan Altima, bearing Alabama license plate number . . ., VIN: . . ., parked outside of the Fortson's apartment. Probable cause being; that Shakea Green, also inside the apartment at the time of Fortson's arrest, stated that she and Fortson had traveled in said Nissan as recently as the previous week.

(Doc. 60-2) at 12-13.

Defendant argues that the warrant should not have issued for the vehicle because it lacked the requisite probable cause. Tr. 1: 118-19. Specifically, Defendant argues that the fact that Green informed officers that she and Defendant "had traveled in said Nissan as recently as the previous week" was insufficient to establish probable cause that the vehicle was being used in furtherance of a crime, especially considering that the affidavit lacked a statement from Rodriguez that vehicles are often used in drug trafficking operations. Tr. 1: 118-19.

In *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002), the Eleventh Circuit set forth guidelines to determine what critical information should be included in a search warrant affidavit to establish a finding of probable cause. The Circuit stated:

It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Hove,* 848 F.2d 137, 140 (9th Cir. 1988) (As "the affidavit offer[ed] no hint as to why the police wanted to search [the] residence" and why they believed they would find incriminating evidence there and there was no link between the location and the defendant, any official belief that the warrant established probable cause was unreasonable.). "The focus in a warrant application is usually on

whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business." *United States v. Procopio,* 88 F.3d 21, 28 (1st Cir. 1996). Thus, the affidavit must contain "sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched." *Pigrum,* 922 F.2d at 253.

Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity. *See United States v. Marion,* 238 F.3d 965, 969 (8th Cir. 2001). The information in the affidavit must also be fresh. *See United States v. Zimmerman,* 277 F.3d 426, 437 (3d Cir. 2002) (Information indicating that pornography had been located on a computer in the home six months before the search was "stale," and there was nothing that transpired during that time period that would suggest that a "hurried judgment" was made to seek the warrant, which would have excused any reasonable mistake.).

Here, the undersigned finds that the affidavit contains enough indicia of probable cause that the issuance of the warrant was not unreasonable. The affidavit contains the following several important facts: (1) that at the time of Defendant's arrest (earlier that morning), officers observed a substance that field tested positive for methamphetamine, marijuana, and a digital scale; (2) that a car registered to Defendant was located in the parking lot of the apartment complex; and (3) that Defendant and Green had traveled in the car as recently as the previous week.

The facts set forth in the affidavit sufficiently explain the suspected criminal activity—i.e., that Rodriguez believed that drugs were being sold, stored, and/or concealed in Defendant's apartment and his vehicle. The facts also sufficiently link the criminal activity to Defendant, as the affidavit specifically referenced the discovery of drugs and a digital scale in Defendant's apartment at the time of Defendant's arrest. Finally, the affidavit linked Defendant to the vehicle through Green's statement that he had traveled in

36

the vehicle within the previous week. Admittedly, the affidavit leaves much to be desired, particularly in the area of linking the vehicle to Defendant to drug activity. However, the undersigned does not find that Defendant's use of the vehicle within the previous week rendered it stale, nor does the undersigned find that the link between Defendant and the vehicle is so weak that no reasonable judge would have issued the search warrant. After all, the affidavit noted that the electronic key for the vehicle was found within the apartment where the drugs and other items were located. Accordingly, the undersigned is not persuaded by Defendant's argument that the warrant lacked probable cause to issue. *See Illinois v. Gates,* 462 U.S. 213, 238 (noting that probable cause exists when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place"); *United States v. Hodge,* 246 F.3d 301, 309 (3d Cir. 2001) ("At a minimum, the affidavit was not clearly lacking in indicia of probable cause, but presented a close call.").

## III.    CONCLUSION

For all of the foregoing reasons, the undersigned RECOMMENDS that Defendant's Motion to Suppress (Doc. 21) be GRANTED in part and DENIED in part. Specifically, the undersigned recommends that the motion to suppress be GRANTED as to the cell phones seized prior to the search warrant issuing for Defendant's apartment and vehicle. The undersigned recommends that the motion to suppress be DENIED as to all evidence found in the apartment as part of the protective sweep and as part of the search conducted pursuant to a search warrant. The undersigned further recommends that the motion be DENIED as

to all evidence found as a result of the search of the vehicle and as to all statements made by Defendant.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **August 9, 2019**.[15] Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v.*

---

[15] Due to the current timing of trial, the undersigned has shortened the usual period for filing objections. *See Sabal Trail Transmission, LLC v. 7.72 Acres In Lee Cty., Alabama*, 2016 WL 10789585, at *1 (M.D. Ala. 2016) ("where exigencies exist, a court may shorten the time for filing objections."); *SEC v. Lauer*, 2016 WL 3225306, *2 (S.D. Fla. Mar. 3, 2016) (shortening the usual fourteen day objection period due to concerns about the fiscal quarter end); *United States v. Williams*, 2016 WL 304320 (M.D. Ala. Jan. 22, 2016) (noting that the magistrate judge ordered that due to exigent circumstances, the objections period was shortened to two days and adopting the report and recommendation); *Esco Marine, Inc. v. SS Pacific Star*, 2011 WL 5026192 at *1, n.1 (E.D. Cal. Oct. 21, 2011) (shortening the time period for objections because "exigencies of the calendar require[d]" it)(quoting *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (holding that trial court did not err in providing parties less than the [then-applicable] full ten-day period to file objections to the magistrate judge's report and recommendation where exigencies existed, stating that the ten-day objections period constituted a "maximum, not a minimum.")); *Alvarez v. Tracey ex rel. Gila River Indian Cty. Dep't of Rehab. & Supervision,* 2012 WL 1038755, at *7 (D. Ariz. Feb. 10, 2012)("[i]n it discretion, the Court will shorten the time for filing of objections")(citing *Tripati v. Drake*, 908 F.2d 977 (9th Cir. 1990) (the court need not afford the parties the full amount of time allotted for filing objections; the time allotted is a maximum, not minimum)).

*City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 31st day of July, 2019.

/s/ Stephen M. Doyle
UNITED STATES MAGISTRATE JUDGE